IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Nov 12, 2010

| | |
|---|---|
| IN RE:<br><br>**CHRISTOPHER DANE LYTLE and BRANDI HIGGINS LYTLE,**<br><br>    **Debtors.** | Case No. 08-11943-M<br>Chapter 7 |
| **SIDNEY K. SWINSON, TRUSTEE,**<br><br>    **Plaintiff,**<br><br>v.<br><br>**TONY R. FRITZ and SILVIA GANDELMAN FRITZ,**<br><br>    **Defendants.** | Adv. No. 09-01129-M |

## MEMORANDUM OPINION

"An ounce of prevention is worth a pound of cure."[1] While this old saying has many uses, it certainly applies to the documentation of contracts. Whether it be something as complex as a pre-nuptial agreement between two people of great wealth, or, as is the case here, as simple as an agreement to build a house, paperwork that correctly reflects the nature of the transaction and the expectations of the parties is invaluable. When the deal goes bad and the documentation is inadequate or does not exist, it is often left to the courts to ascertain the nature of the contract. Those determinations can be expensive. In our case, two people decided to build a residence for resale. One of them ended up in bankruptcy court. The house in question was ultimately built, not by our debtor, but by a third party. This Court must now decide the interests of the various parties

---

[1] An idiom attributed to Benjamin Franklin.

in the house.  The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).[2] Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C. § 157(a).  This is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(F) and (H).

## Findings of Fact

Christopher Lytle ("Lytle") was, for a period of approximately nine years, a home builder in the Owasso, Oklahoma, area.  He is married to Brandi Lytle (Mr. and Mrs. Lytle shall hereafter be collectively referred to as "Debtors").  During his career as a home builder, Lytle constructed between 50 and 60 homes, many through his limited liability corporation, Canterbury Homes, LLC. Lytle did little or no actual construction work; instead, he acted as a general contractor, procuring subcontractors and overseeing the building process.

Tony Fritz ("Fritz") is a commercial loan officer employed by a bank in Owasso, Oklahoma. He has over 20 years experience in the banking industry.  Much of his experience relates to consumer lending, including residential real estate loans.  Fritz and Lytle became acquainted as a result of attending the same church.  Fritz was aware of Lytle's involvement in the construction business, and came to believe that Lytle was capable of building a high quality home.

At some time prior to August of 2007, Lytle and Fritz entered into an agreement regarding the construction of homes.  Under the terms of the agreement, Fritz was to provide all financing for

---

[2] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et. seq.* (West 2010).

the purchase of a lot and the construction of the residence thereon. Lytle was to use his expertise to procure the appropriate subcontractors and oversee construction. The parties contemplated that profits from the sale of a finished residence would be split on a 50-50 basis. If the property were sold for a loss, Fritz testified that the loss would be borne by him and him alone. In other words, he did not expect Lytle to contribute any funds to this arrangement under any circumstances. The parties apparently did not reduce their agreement to writing.[3]

When Fritz purchased the first lot, title was taken in the name of Fritz and Lytle as joint tenants and not as tenants in common. Both Fritz and Lytle testified that the purpose of taking title in this fashion was as a "show of good faith" to ensure that Lytle would receive his share of the profits upon sale of the residence. Both testified that it was not their intention that Lytle actually obtain any ownership in the lot as a result.

The agreement went as planned with respect to the construction of one house. Lytle acted as builder as agreed, and the house was constructed and ultimately sold, with each party earning a profit of approximately $15,000. While Fritz did not suggest that the amount of the profit was unacceptable to him, Lytle indicated that the profit was insufficient, noting that the $15,000 represented a payment for approximately six months' worth of his time and effort.

The dispute before the Court focuses upon the second lot. On or about August 31, 2007, Fritz paid $65,000.00 for a vacant lot at 13801 E. 94th St. North, Owasso, OK 74055 (the "Lot"). The purchase price for the Lot was paid in part with a $43,000.00 loan from Fritz's parents, Kenneth R. and Doralee Fritz, pursuant to a Promissory Note. Fritz alone was obligated to repay the

---

[3] At trial, Fritz testified that there was a written agreement with respect to the first house to be constructed. However, he was unable to produce the same and no written agreement is in evidence before the Court.

$43,000.00 loan. Although Fritz paid the entire purchase price for the Lot, Fritz and Lytle were jointly named as grantees of title to the Lot in a Joint Tenancy Warranty Deed, which was recorded in the records of the Tulsa County Clerk on September 6, 2007 ("Deed 1"). Debtors provided no monetary or other consideration towards the purchase price, insurance, taxes, or loan payments for the Lot. As with the first lot, both Fritz and Lytle testified that the purpose of taking title in this fashion was as a "show of good faith" to ensure that Lytle would receive his share of the profits upon sale of the residence. Both testified that it was not their intention that Lytle actually obtain any ownership in the Lot as a result of Deed 1.[4] The parties have stipulated that Fritz and his wife (hereafter collectively referred to as "Defendants") did not intend to make a gift of an undivided one-half interest in the Lot to Lytle or the Debtors, nor did they intend to make a loan to Lytle or the Debtors to enable them to purchase an undivided one-half interest in the Lot.

In June of 2008, Lytle made the decision to get out of the home construction business. At the time, Lytle was experiencing significant financial difficulty, at least in part due to the failure of Countrywide Home Loans ("Countrywide"), then a national provider of residential mortgage financing. Lytle had obtained approval for a mortgage loan with Countrywide for a house he had constructed for use as his personal residence. When Countrywide failed, Lytle was unable to pay all of his subcontractors on this property, and was unable to obtain any manner of financing for his home. During this time, Lytle contacted Fritz and explained that he did not want to go forward with construction of a residence upon the Lot. Lytle told Fritz that he had decided to return to school to pursue his dream of becoming a veterinarian. Fritz accepted the explanation without question.

---

[4] Lytle went so far as to testify that, with respect to the Lot, placing his name on the title should never have happened.

Debtors offered to execute a deed to the Lot back to Defendants. This would enable Fritz to find another contractor and proceed with the construction of a residence on the Lot. Fulfilling their promise, Debtors executed a Warranty Deed conveying all of their interest in the Lot to Defendants. The Warranty Deed, dated June 17, 2008, was recorded with the Tulsa County Clerk on June 23, 2008 ("Deed 2"). Defendants gave no monetary or other consideration to the Debtors for Deed 2. At trial, Lytle testified that he executed Deed 2 in order to "return [to Fritz] something that was never mine." At no time did Lytle consider himself to hold an ownership interest in the Lot.

On August 22, 2008, Debtors filed their voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Oklahoma (the "Bankruptcy Case"). Sidney K. Swinson ("Swinson") was appointed to serve as trustee. In their bankruptcy schedules, the Debtors listed $423,858.00 in assets, and $545,050.11 in liabilities.[5] Lytle testified that his financial condition did not change significantly between June 23, 2008 (the date that Debtors executed Deed 2), and the date the schedules were filed. Debtors did not claim any interest in the Lot in their schedules, nor did they list Fritz as a creditor. Fritz had no actual knowledge of the fact that Debtors had sought bankruptcy relief.

After receipt of Deed 2, Fritz went forward with his plans to construct a residence on the Lot. On September 5, 2008, Fritz entered into a written Letter of Agreement (the "Letter Agreement") with Taylor Hutchings ("Hutchings"), who agreed to serve as contractor to construct a residence (the "Residence") on the still undeveloped Lot. In payment, Hutchings would receive one-half of any profits realized from the sale of the Lot and Residence. Construction of the Residence took place between September 2008 and June 2009. Pursuant to the Letter Agreement, Defendants paid, either

---

[5] *Trustee's Exhibit No. 6-4.*

via their own funds or a loan from Fritz's parents, all expenses for materials, permits, and construction of all improvements for the Lot, for which the Defendants would be repaid in full with interest upon sale of the Residence. Defendants paid a total of $326,630.99 towards the development of the Lot, together with taxes, insurances, utilities and related expenses. They have paid and continue to pay $104.76 per month in insurance, $100.00 per month for lawn maintenance, and approximately $300.00 per month for utilities and related expenses. The current ad valorem taxes are $4,438.00 per year. Lytle completed no construction or other improvements on the Lot. Debtors contributed no monetary or other consideration towards the development of the Lot.

Fritz did not have notice of the Bankruptcy Case until after completion of the Residence.[6] He did not learn of the Bankruptcy Case until a title examination disclosed it as a potential cloud upon the title to the Residence. Fritz sought a release of any interest in the Residence from Swinson. This litigation followed. Swinson contends that he is entitled to recover a one-half interest in the Residence and all improvements thereon. Fritz contends that Swinson is entitled to nothing.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

## Conclusions of Law

Swinson seeks to set aside Deed 2 as either a preference under § 547 or a constructively fraudulent transfer under § 548(a)(1)(B). In order to consider either theory, the Court must decide what interest, if any, Debtors held in the Residence by virtue of Deed 1. Such determinations are

---

[6] For purposes of convenience, the terms "Lot" and "Residence" are used interchangeably for the remainder of this memorandum opinion.

made by reference to state law.⁷ Where there is an issue regarding the existence of a resulting trust, that issue is also governed by state law.⁸

*The Nature of Debtors' Interest in the Residence*

Under Oklahoma law, "[w]hen a transfer of real property is made to one person, and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made."⁹ This type of trust is commonly referred to as a "resulting trust." Under § 137,

> [t]he party claiming a resulting trust in another's legal estate is required to show - by clear, satisfactory and convincing proof - that he (or she) either paid or secured the payment of the consideration at the time of purchase. Once that burden is met, the law will raise a resulting trust; and the onus of going forward with the evidence to rebut (or overcome) that presumption is shifted to the holder of the realty's legal title.¹⁰

Under Oklahoma law, a party taking title subject to a resulting trust takes only bare legal title to the property; equitable title and the beneficial interest in the property are held by the individual or entity that paid the consideration to acquire the real property.¹¹ Although the Court has been unable to

---

⁷ *Butner v. U.S.*, 440 U.S. 48, 54 (1979).

⁸ *Montoya v. Garcia (In re Garcia)*, 367 B.R. 778, 781 (Bankr. D.N.M. 2007) (citing *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1341 (10th Cir. 1998) and *United States Dept. of Energy v. Seneca Oil Co. (In re Seneca Oil Co.)*, 906 F.2d 1445, 1450 (10th Cir. 1990)).

⁹ Okla. Stat. Ann. tit. 60, §137 (2010) (hereafter "§ 137").

¹⁰ *Boatwright v. Perkins,* 894 P.2d 1091, 1094-95 (Okla. 1995) (footnotes omitted).

¹¹ *See, e.g., Powell v. Chastain*, 318 P.2d 859, 862 (Okla. 1957) ("Resulting trusts are those which arise where the legal estate in property is disposed of or acquired, not fraudulently or in violation of any fiduciary duty, but the intent appears or is inferred from the terms of the disposition, or from the accompanying facts and circumstances, that the beneficial interest is not to go to or be enjoyed with the legal title. In such a case, a trust is implied or results in favor of the person for whom the equitable interest is assumed to have been intended, and whom equity deems to be the real owner."); *Epps v. Pearman*, 248 P.2d 590, 592 (Okla. 1952) ("Resulting

locate any Oklahoma law on point, courts in other states have held that an individual or entity holding property subject to a resulting trust has a duty to reconvey the property to the holder of the beneficial interest upon demand.[12]

The parties have stipulated that Defendants paid for the Lot and all costs associated with the construction of the Residence. Therefore, under § 137, the presumption of resulting trust has been established. Swinson admits the existence of the presumption. He contends that the facts before the Court rebut the presumption, and support a finding that the parties intended to provide Lytle with an undivided one-half ownership interest in the Residence. The Court disagrees.

Fritz and Lytle testified without objection or contradiction that neither intended for Lytle to obtain any ownership interest in the Residence. The parties have stipulated that Defendants did not intend to provide Lytle with an undivided one-half interest in the Residence by gift, or to provide Lytle with financing to enable him to obtain an interest in the Residence. The Court finds that the parties intended, at most, to provide a mechanism that would ensure that Lytle would be paid for his efforts at building a house on the Lot upon its sale. This arrangement, while clumsily documented, does not support a finding that Lytle held an undivided one-half ownership interest in the Residence nor does it operate to rebut the statutory presumption. The Court finds that any interest Lytle held

---

trusts are those which arise where the legal estate in property is disposed of, conveyed, or transferred, but the intent appears or is inferred from the terms of the disposition, or from accompanying facts and circumstances, that the beneficial interest is not to go to or be enjoyed with the legal title. In such case, a trust is implied or results in favor of the person for whom the equitable interest is assumed to have been intended, and whom equity deems to be the real owner.") (citations omitted).

[12] *Belford v. Cantavero (In re Bassett)*, 221 B.R. 49, 54 (Bankr. D. Conn. 1998); *Cowden v. Ramsay (In re Cowden)*, 154 B.R. 531, 534 (Bankr. E.D. Ark. 1993); *Shelton v. Harrison,* 167 S.W. 634, 638 (Mo. App. 1914).

in the Residence was subject to a resulting trust. The Court thus concludes that Lytle held bare legal title to the Lot during the time frame between August 31, 2007, the date of the purchase of the Lot, and June 17, 2008, the date that Debtors executed Deed 2.

*May Swinson Set Aside Deed 2 as a Preference?*

The elements of a preference action are spelled out in § 547(b) of the Bankruptcy Code:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property–

    (1) to or for the benefit of a creditor;
    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3) made while the debtor was insolvent;
    (4) made–
        (A) on or within 90 days before the date of the filing of the petition; or
        (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
    (5) that enables such creditor to receive more than such creditor would receive if–
        (A) the case were a case under chapter 7 of this title;
        (B) the transfer had not been made; and
        (C) such creditor received payment of such debt to the extent provided by the provisions of this title.[13]

In order for a transfer to be deemed preferential, each of these elements must be present. The parties do not dispute that Deed 2 was executed less than 90 days prior to the filing of Debtors' bankruptcy petition. For purposes of its decision, the Court presumes that Debtors were insolvent at the time they executed Deed 2. The central issue appears to be whether the execution of Deed 2 was a "transfer" for purposes of this section. If there is no transfer, there can be no preferential transfer. The question is whether the transfer of bare legal title by one holding that title in resulting trust is

---

[13] § 547(b).

9

a transfer of an interest in property.

Several courts have held that the pre-petition transfer of bare legal title by a debtor does not constitute a transfer for purposes of either § 547 or § 548. In *Belford v. Cantavero (In re Bassett)*,[14] the debtor was a certified public accountant involved in real estate development. An acquaintance of the debtor, also involved in a real estate development, owned certain real estate located in Connecticut. The debtor's friend was unable to obtain financing with respect to his real estate. However, the lender indicated that it would be happy to make the loan to the debtor, assuming the debtor owned the property. Desperate for the loan, the debtor's friend conveyed the property to the debtor. The debtor then obtained the loan, transferring all the proceeds to the friend who used them to develop the property. Within 90 days prior to the filing of the bankruptcy case, the debtor reconveyed his interest in the property back to his friend without payment. The debtor then filed bankruptcy, and the trustee sought to avoid the reconveyance of the property back to the debtor's friend as a preference and a fraudulent conveyance. The bankruptcy court noted that

> The Debtor held legal title to the Property. Yet, because a resulting trustee has an absolute duty to reconvey legal title to the beneficial owner upon demand, bare legal title is not an interest of any value to the Debtor, or to his bankruptcy estate upon a putative avoidance and recovery of such bare legal title.[15]

The court thus declined to grant the trustee any relief with respect to the property. The court also found that there was no antecedent debt for purposes of § 547(b)(2).

In *Geremia v. Dwyer (In re Dwyer)*,[16] the debtor's mother purchased residential real estate

---

[14] 221 B.R. 49 (Bankr. D. Conn. 1998).

[15] *Id.* at 54 (citation and footnote omitted).

[16] 250 B.R. 472 (Bankr. D.R.I. 2000)

10

in 1978. At the time the property was acquired, she had the debtor's name placed on the deed. The debtor's mother paid all of the mortgage and tax obligations, utilities, insurance, and repair bills pertaining to the property. In May of 1998, the debtor was experiencing marital difficulties. At his mother's request, he conveyed his interest in the property back to her. Less than one year later he filed for relief under chapter 7 of the United States Bankruptcy Code. The trustee in his case brought an adversary proceeding against the debtor's mother seeking to avoid the May 1998 conveyance as a fraudulent transfer. The analysis of the bankruptcy court in *Dwyer* is applicable here.

> The parties agree as to the debtor's interest in the subject Property, and that the issue is whether "bare legal title" to property constitutes an economic interest. With no factual issues in dispute, we conclude as a matter of law that the Debtor's bare legal title to the Property does not constitute an economic interest.
>
> This result is supported by the many cases holding that when a debtor holds only bare legal title, and not equitable title to property, only the legal title becomes part of the debtor's bankruptcy estate. *See In re Torrez*, 63 B.R. 751, 753 (9th Cir. BAP 1986), *aff'd*, 827 F.2d 1299 (9th Cir. 1987) ("where the debtor possesses only a legal and not an equitable interest in property, the equitable interest does not become part of the estate"); *In re Halabi*, 184 F.3d 1335, 1337 (11th Cir. 1999) ("where the debtor holds bare legal title without any equitable interest, the estate acquires bare legal title without any equitable interest").
>
> Because Maurice never held more than bare legal title to the subject Property, which conferred no tangible economic value upon the estate, the transfer of the bare legal title back to his mother did not constitute a fraudulent conveyance. "Thus, measured in an economic sense, the conveyance of the Debtor's interest in the subject property to the Defendant had no value. Thus, the transfer cannot be challenged as a fraudulent transfer under § 548(a)(2)." *In re Gillman*, 120 B.R. 219, 220 (Bankr. M.D. Fla. 1990); *see also In re Stoffregen*, 206 B.R. 939, 941 (Bankr. E.D. Wis. 1997)("[v]arious Courts have held that transfers within one year of bankruptcy for no consideration are not avoidable as fraudulent if the debtor only holds bare legal

11

> title").
>
> In *Gillman*, as in the instant case, the trustee attempted to set aside as a fraudulent conveyance the transfer of property from the debtor to his mother. The Court held that because the debtor held only bare legal title, the equitable title to the property was not a part of his bankruptcy estate. 120 B.R. at 220. Likewise in *Stoffregen*, the trustee sought to avoid the transfer to the debtor's mother and brother of a one-third interest in real property. The court there held that because the debtor held only bare legal title to the property, "his reconveyance of his 1/3 interest to [his mother and brother] was for no real value. Because the transfer had no real value, it cannot be challenged as fraudulent under 11 U.S.C. § 548(a)(2)." *Stoffregen*, 206 B.R. at 942. Finally, the United States Supreme Court, in discussing the applicability of 11 U.S.C. § 541(a)(1), has held:
>
>> Section 541(a)(1) speaks in terms of the debtor's "interest . . . in property," rather than property in which the debtor has an interest, but this choice of language was not meant to limit the expansive scope of the section. *The legislative history indicates that Congress intended to exclude from the estate property of others in which the debtor had some minor interests such as a lien or bare legal title*.
>
> *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 8, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) (emphasis added).[17]

The bankruptcy court denied the trustee relief.

The principles applied in *Bassett*, *Dwyer,* and the cases they cite are applicable to this case. Lytle held bare legal title to the Residence, subject to a resulting trust. The execution of Deed 2 divested Lytle of nothing of value. It did not constitute a transfer for purposes of § 547. The preference claim fails.

Even if the execution of Deed 2 constitutes a transfer under § 547, Swinson has not carried his burden to show the existence of an antecedent debt owed by Lytle to Fritz. There is no evidence

---

[17] *Id.* at 474–75.

of any monetary obligation owed by Lytle to Fritz at the time Deed 2 was executed. Neither Lytle nor Fritz believed that such a monetary obligation existed. Deed 2 was executed to allow Lytle and Fritz to part ways. The lack of an antecedent debt is equally fatal to Swinson's claim of preference.

*May Swinson Set Aside Deed 2 as a Fraudulent Transfer?*

Swinson has brought a second cause of action against the Defendants under § 548(a)(1)(B), which provides that

> (1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> * * *
>
> (B)
>
> (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)
>
> (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.][18]

In order to prevail under this section, Swinson must establish that Deed 2 constituted a transfer of interest in property owned by Lytle. This he cannot do, based upon the analysis contained in *Bassett* and *Dwyer* and adopted by this Court.

At all times relevant hereto, any interest held by Lytle in the Residence was subject to a resulting trust in favor of Fritz. As a result, the execution of Deed 2 did not constitute a transfer for

---

[18] § 548(a)(1)(B).

purposes of § 548. If there is no transfer of an interest under the law, there can be no fraudulent transfer. The Trustee's second cause of action fails.

*Use of the Avoiding Powers Created by § 544(a)(3)*

Swinson also relies upon § 544(a)(3) as a basis for claiming an interest in the Residence. The section provides that

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
>
> * * *
>
> (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.[19]

Section 544(a)(3) cannot be used to defeat an interest in real property that is a matter of public record, as any purchaser of the property would be on constructive notice of its existence.[20] In order for a trustee to utilize the powers that exist under § 544(a)(3), a debtor must have had some interest in the property at issue as of the commencement of the case. If the debtor conveyed all of his or her interest in real property prior to the filing of the bankruptcy case, and the transfer is not subject to avoidance, § 544(a)(3) provides neither a right nor a remedy. Such is the case here.[21]

---

[19] § 544(a)(3).

[20] *See Hamilton v. Wash. Mut. Bank FA (In re Colon)*, 563 F.3d 1171, 1185–1186 (10th Cir. 2009) (stating that where a mortgage was a matter of public record, the mortgage was not subject to avoidance under § 544(a)(3) (applying Kansas law)).

[21] Swinson relies upon several cases that stand for the proposition that where an interest in property (such as a resulting trust) is not apparent as a matter of public record, a bankruptcy trustee has the power under § 544(a)(3) to set aside the interest and claim the property for the

Swinson contends that § 544(a)(3) allows him to claim the Residence regardless of the resulting trust. The fly in the ointment is that § 544(a)(3) comes into play if and only if Deed 2 may be set aside. The Court has answered that question in the negative. Deed 2 was executed and recorded prior to the filing of the Bankruptcy Case. Anyone purchasing the Residence from Debtors after Deed 2 was recorded would be on constructive notice of the fact that Debtors had conveyed any and all interest in the Residence to the Defendants, and would take nothing. Section 544(a)(3) does not change that result, and does not give Swinson an interest in the Residence.

## Conclusion

Swinson is not entitled to set aside Deed 2 as either a preference or a fraudulent transfer. As a result, he has no interest in the Residence, and may not use the powers granted him under § 544(a)(3) to obtain an interest in the Residence. This adversary proceeding shall be dismissed with prejudice, with the parties to bear their own fees and costs.

A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 12th day of November, 2010.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

5946.7

---

benefit of creditors. *See, e.g., Burns v. Creech*, 350 B.R. 24 (Bankr. M.D.N.C. 2006); *Bakst v. Corzo (In re Corzo)*, 406 B.R. 154 (Bankr. S.D. Fla. 2008); *In re Project Homestead, Inc.,* 374 B.R. 193 (Bankr. M.D.N.C. 2007). Each of these cases is factually inapposite to the case at bar. In each case relied upon by Swinson, **record title in the property at issue was in the name of the debtor as of the commencement of the case**. Those are not our facts.